OPINION OF THE COURT
Kristin Booth Glen, J.
Defendants move, in limine, to exclude evidence and testimony that liquid injectable silicone is not approved by the United States Food and Drug Administration (FDA) on the ground that, inter alia,[1] it is irrelevant to any issue raised in this malpractice action. Plaintiff Retkwa has alleged two causes of action, one claiming injury from the negligence of the defendants by virtue of their departure from good and accepted medical practice, and the second, also in medical malpractice, sounding in lack of informed consent.
The issue to be decided is, therefore, one of first impression: whether information about the FDA status of an unapproved injectable substance is part of the information concerning "risk” covered by New York’s extremely limited informed consent statute, Public Health Law § 2805-d (1). Resolution of the issue in turn requires consideration of the history and case law exegesis of that statute.
STATUTORY HISTORY
The present statute is the result of more than 70 years of legal history. Recovery for injuries from an operation not performed with the "informed consent” of the patient was originally premised in the law of battery; the germinal case was Schloendorff v Society of N. Y. Hosp. (211 NY 125 [1914]) where Judge Cardozo set forth the principles underlying re *166 covery: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient’s consent, commits an assault, for which he is liable in damages * * * This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained.” (Supra, at 129-130.)[2]
Because of problems with the battery approach, the 1960’s saw a transition away from that theory towards negligence law for failure to obtain consent without full disclosure of all known risks. The original standard in informed consent negligence cases was directed to those disclosures which would be made by a reasonable medical practitioner under the same or similar circumstances. (See, e.g., Natanson v Kline, 186 Kan 393, 350 P2d 1093 [1960], reh denied 187 Kan 186, 354 P2d 670 [1960].) This physician-based standard, considered the majority view, was generally adopted in New York (see, e.g., Petterson v Lynch, 59 Misc 2d 469 [Sup Ct, Erie County 1969]). Subsequent to the landmark decision in Canterbury v Spence (464 F2d 772 [DC Cir 1972]) New York adopted the Canterbury materiality standard of disclosure to protect the patient’s right to self-determination. (See, e.g., Fogal v Genesee Hosp., 41 AD2d 468 [4th Dept 1973]; Garone v Roberts’ Tech. & Trade School, 47 AD2d 306 [1st Dept 1975] [citing Canterbury and Fogal]; Zeleznik v Jewish Chronic Disease Hosp., 47 AD2d 199 [2d Dept 1975] [same]; see generally, Comment, Medical Malpractice in New York, 27 Syracuse L Rev 657, 727-738 [1976] [Medical Malpractice])
The statutory codification of the doctrine of informed consent was the result of legislative pressure to limit or abolish the doctrine in New York (Medical Malpractice, op. cit, at 738-739), and was passed in response to the threat of a physicians’ strike in 1975. (See, Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4401-a, at 440.) The statute returned New York to the so-called "majority view”[3] which employs a professional standard test. Thus, *167 informed consent is measured not by what a reasonable patient would want or need to know, but what a competent physician believes the patient ought to know under his or her circumstances. Public Health Law § 2805-d reads as follows: "1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical * * * practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.” In addition, by statute, New York requires expert medical testimony to establish a prima facie case of lack of informed consent (CPLR 4401-a). Thus, although the professional standard has been criticized as "anachronistic paternalism”, e.g., Largey v Rothman (110 NJ 204, 540 A2d 504 [1988]),[4] it is, nevertheless, the standard which must be applied here. However, as at least one commentator has suggested: "ambiguities in statutory language, as well as the existence of consent issues not contemplated by the statute, will require close judicial scrutiny in order to achieve equitable application of the doctrine”. (Medical Malpractice, op. cit., at 739.)
STATUTORY INTERPRETATION
Since the enactment of Public Health Law § 2805-d (1), the courts of this State have engaged in just such “close judicial scrutiny” and sensitivity to the underlying bases of the informed consent doctrine. Although the ordinary malpractice informed consent case generally involves a claim that the doctor, usually a surgeon, did not inform the patient of certain risks of the procedure to be performed, the simple "risk” formulation does not take into account all of the manifestations of informed consent, and the courts have so recognized.
For example, in Nisenholtz v Mount Sinai Hosp. (126 Misc 2d 658 [Sup Ct, NY County 1984], affd 115 AD2d 1022 [1st *168 Dept 1985]), the court found that a description of the procedures to be performed rather than simply a doctor’s statement of "risks” was necessary to enable the patient to determine the risks of the procedure for himself, and so to determine whether or not he wished to forego that procedure.[5] (See also, Brandon v Karp, 112 AD2d 490 [3d Dept 1985] [discussion of procedure to be performed].)
The underlying premise of these and similar cases is that determination of whether to undergo risk is still the patient’s, and she is entitled to such information from the physician, albeit based on professional standard, as is necessary to assess the risk and make a reasonable decision about her treatment. The question presented here, whether the physician was required to tell the patient that the substance, liquid silicone, with which he was going to inject her had not been approved by the FDA, is a novel one, but fits relatively comfortable into the framework created by earlier decisions.
There can be little question that in assessing the risk of a drug or injectable substance, a reasonable patient would want information as to whether that drug or substance has been tested and/or approved by Federal authorities.[6] In an analogous situation, Arizona, a State which also applies the professional standard, has found that in order to obtain informed consent, a physician using an investigational drug (that is, one which the FDA permits to be used in an investigation, but which it has not approved) or contemplating a novel or investigational procedure, must inform his patient of its novelty or its investigational status. (See, Gaston v Hunter, supra, 121 Ariz, at 57-58, 588 P2d, at 350-351.) In Arizona, as in New York, a physician’s testimony is necessary to set forth the *169 professional standard or what a reasonable doctor would do under the circumstances.
Here, plaintiff has made an offer of proof that an expert witness will testify that a doctor working with liquid silicone in the fields of dermatology and/or plastic surgery in 1982 or 1983 would, as a regular matter, have informed the patient that liquid silicone was not approved by the FDA. Such testimony, assuming it is given at trial, would make out a prima facie case of lack of informed consent.
Accordingly the admission of evidence about lack of FDA approval, in this context, would be entirely material and relevant to the issues presented in this malpractice action. So long as the evidence is given in this form, and to the end of demonstrating that the patient was entitled to information about the FDA status of liquid silicone so that she could exercise her "right to determine what should be done with [her] own body” (Schloendorff v Society of N. Y. Hosp., supra, 211 NY, at 129), evidence about the FDA status of liquid silicone is admissible and the motion is denied.

. Defendants also move to exclude testimony about non-FDA approval on the grounds that liquid silicone is exempt from FDA regulation because it fits within the "custom device” exemption, and that the Federal Food, Drug and Cosmetic Act was not intended to regulate physicians in their practice of medicine. This is, of course, a medical malpractice action, not a products liability case, and as such non-FDA approval of silicone would be generally inadmissible. (See, Gaston v Hunter, 121 Ariz 33, 588 P2d 326 [Div One 1978].) In a products case, even putting aside traditional evidentiary problems of admissibility, if the issue of nonapproval were permitted to come in, legal issues of coverage and/or noncoverage would have to be determined. However, on the informed consent issue which defendants raise here, the question is not whether liquid silicone is a good or bad substance, whether it is a covered device or a "custom device” under the Federal Food, Drug and Cosmetic Act and applicable regulations, but rather what the patient has a right to be told by her doctor. Thus I need not now decide the other issues raised by defendants on this motion.

. The Court of Appeals has recently reaffirmed the fundamental right to determine what is to be done with one’s body, e.g., Rivers v Katz (67 NY2d 485 [1986] [institutionalized patient’s right to refuse psychotropic medicine]).

. Although commentators continue to refer to the physician-based standard as the majority view, as of August 1991, some 20 States had adopted the patient or materiality-based standard. (See, Annotation, Modern Status of Views as to General Measure of Physician’s Duty to Inform Patient of Risks of Proposed Treatment, 88 ALR3d 1008, § 6, 1991 Supp, at 71.)

. The New Jersey Supreme Court overruled its prior use of the physician-based standard after a thorough review of the Canterbury "prudent patient” or "materiality of risk” standard, writing: "The foundation for the physician’s duty to disclose in the first place is found in the idea that 'it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie’ * * * In contrast the arguments for the 'professional’ standard smack of an anachronistic paternalism that is at odds with any strong conception of a patient’s right of self-determination”. (Supra, 110 NJ, at 214, 540 A2d, at 509.)

. As Justice Gammerman wrote (supra, 126 Misc 2d, at 661): "Defendants acknowledge that a physician must describe the risks facing the patient, by which is meant the undesired result of the procedure * * * [and] indicate the likelihood of the occurrence of the risk * * * However, defendants suggest that, as a matter of law, physicians need provide no further information, unless asked to do so by the patient. Such a standard would create an artificial, inflexible, and overly restrictive limit on the information which must be provided to patients. It may be that, in many cases, merely identifying the risks and their likelihood of occurrence would suffice, but there undoubtedly exist many other cases in which a more detailed description of the causes of potential harm would be necessary.”

. It is a reasonable assumption that most patients, confronted with a doctor’s recommendation for injection of a foreign substance, presume that such substance has been the subject of official testing, consideration, and approval, and implicitly or explicitly rely on this presumption as part of the basis of their "consent” to the treatment.