Judge LIVINGSTON dissents in a separate opinion.
CHIN, Circuit Judge:
Defendant-appellant Alfred Caronia appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Eric N. Vitaliano, /.) on November 30, 2009, following a jury trial at which Caronia was found guilty of conspiracy to introduce a misbranded drug into interstate commerce, a misdemeanor violation of 21 U.S.C. §§ 331(a) and 333(a)(1). Specifically, Caronia, a pharmaceutical sales representative, promoted the drug Xyrem for “off-label use,” that is, for a purpose not approved by the U.S. Food and Drug Administration (the “FDA”). Caronia argues that he was convicted for his speech — for promoting an FDA-approved drug for off-label use — in violation of his right of free speech under the First Amendment. We agree. Accordingly, we vacate the judgment of conviction and remand the case to the district court.

STATEMENT OF THE CASE

1. The Regulatory Scheme
Under the Federal Food, Drug and Cosmetic Act (the “FDCA”), before drugs are *153 distributed into interstate commerce, they must be approved by the FDA for specific uses. 21 U.S.C. § 355(a). To obtain FDA approval, drug manufacturers are required to demonstrate, through clinical trials, the safety and efficacy of a new drug for each intended use or indication. 21 U.S.C. § 355(d); see Weinberger v. Hynson, 412. U.S. 609, 612-14, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).[1]
Once FDA-approved, prescription drugs can be prescribed by doctors for both FDA-approved and -unapproved uses; the FDA generally does not regulate how physicians use approved drugs. See Buckman Co. v. Plaintiffs’ Legal Comm., 531 U.S. 341, 350, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001); Weaver v. Reagen, 886 F.2d 194, 198 (8th Cir.1989); John E. Osborn, Can I Tell You The Truth? A Comparative Perspective on Regulating Off-Label Scientific and Medical Information, 10 Yale J. Health Pol’y L. & Ethics 299, 303 (2010) (“Physicians may prescribe FDA-approved drugs ... for any therapeutic use that is appropriate in their medical judgment.”); Randall S. Stafford, Regulating Off-Label Drug Use: Rethinking the Role of the FDA, 358 N. Engl. J. Med. 1427, 1427 (2008) (discussing 2003 study of 160 common drugs where off-label use accounted for approximately 21 percent of prescriptions).
Indeed, courts and the FDA have recognized the propriety and potential public value of unapproved or off-label drug use. See Buckman, 531 U.S. at 350, 121 S.Ct. 1012 (Off-label use is an “accepted and necessary corollary of the FDA’s mission to regulate in this area without directly interfering with the practice of medicine.”); Weaver, 886 F.2d at 198-99 (“FDA[-]approved indications were not intended to limit or interfere with the practice of medicine nor to preclude physicians from using their best judgment in the interest of the patient.” (internal quotation marks omitted)); U.S. Food and Drug Administration, Draft Guidance, Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices 3 (2009) (“[0]ff-label uses or treatment regimens may be important and may even constitute a medically[-]recognized standard of care.”).[2] The FDA itself has observed:
Once a drug has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling. Such “unapproved” or, more precisely, “unlabeled” uses may be appropriate and rational in certain circumstances, and may, in fact, reflect approaches to drug therapy that have been extensively reported in medical literature.
U.S. Food and Drug Administration, FDA Drug Bulletin, 12 FDA Drug Bull. 1, 5 (1982).
*154 The FDCA prohibits “misbranding,” or “[t]he introduction or delivery for introduction into interstate commerce of any ... drug ... that is ... misbranded.” 21 U.S.C. § 331(a). A drug is misbranded if, inter alia, its labeling fails to bear “adequate directions for use,” 21 U.S.C. § 352(f), which FDA regulations define as “directions under which the lay[person] can use a drug safely and for the purposes for which it is intended,” 21 C.F.R. § 201.5.[3] FDA regulations define intended use by reference to “the objective intent of the persons legally responsible for the labeling of drugs,” which may be demonstrated by, among other evidence, “oral or written statements by such persons or their representatives” and “the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised.” 21 C.F.R. § 201.128.
The consequences for misbranding are criminal. 21 U.S.C. § 333(a)(2) (“[I]f any person commits such a violation ... such persons shall be imprisoned for not more than three years or fined not more than $10,000, or both.”). Pharmaceutical manufacturers and their representatives can face misdemeanor charges for misbrand-ing or felony charges for fraudulent mis-branding. 21 U.S.C. § 333(a); see Osborn, Can I Tell You The Truth?, swpra, at 328-29 (collecting cases). The government has repeatedly prosecuted — and obtained convictions against — pharmaceutical companies and their representatives for misbranding based on their off-label promotion. See, e.g., Judgment, United States v. GlaxoSmithKline, LLC, 12-cr-10206 (RWZ), ECF Doc. No. 13 (D.Mass. July 10, 2012) (Information, GlaxoSmithK-line, No. 12-cr-10206 (RWZ), ECF Doc. No. 1 (D.Mass. July 2, 2012)); Judgment, United States v. Merck Sharp & Dohme Corp., No. 11-cr-10384 (PBS), ECF Doc. No. 30 (D.Mass. May 18, 2012) (Information, Merck, No. 11-cr-10384 (PBS), ECF Doc. No. 1 (D.Mass. Nov. 22, 2011)); Agreed Order of Forfeiture, United States v. Abbott Labs., No. 12-cr-26 (SGW), ECF Doc. No. 7 (W.D.Va. May 7, 2012) (as a result of the guilty plea to the Information (Information, Abbott, No. 12-cr-26 (SGW), ECF Doc. No. 5-1 (WJD.Va. May 7, 2012))); Judgment, United States v. Aller-gan, Inc., No. 10-cr-375 (ODE), ECF Doc. No. 20 (N.D.Ga. Oct. 7, 2010) (Information, Allergan, No. 10-cr-375 (ODE), ECF Doc. No. 1 (N.D.Ga. Sept. 1, 2010)); see Sentencing Transcript, Merck, No. llcr-10384 (PBS), ECF Doc. No. 27 (D. Mass. April 30, 2012) (“I want to emphasize that off-label marketing has been ... a big problem .... I hope in a way that the ... fact that all these cases are being pressed by the federal and state governments, the 44 state Attorney Generals, will be a signal that it isn’t acceptable conduct.”); see also Press Release, U.S. Department of Justice, GlaxoSmithKline to Plead Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data, Largest Health Care Fraud Settlement in U.S. History (July 2, 2012); Osborn, Can I Tell You The Truth?, supra, at 328-29.
The FDCA and its accompanying regulations do not expressly prohibit the “promotion” or “marketing” of drugs for off-label use. The regulations do recognize that promotional statements by a pharmaceutical company or its representatives can serve as proof of a drug’s intended use. *155 See 21 C.F.R. § 201.5. Off-label promotional statements could thus presumably constitute evidence of an intended use of a drug that the FDA has not approved. See id. The FDA, however, has concluded that “[a]n approved drug that is marketed for an unapproved use (whether in labeling or not) is misbranded because the labeling of such drug does not include ‘adequate directions for use.’ ” See FDA, Draft Guidance, supra, at 2-3 (quoting 21 U.S.C. § 352(f)); accord United States v. Caro-nia, 576 F.Supp.2d 385, 392 n. 5 (E.D.N.Y. 2008); see also Gov’t Br. 48 n.18 (contending no set of directions can constitute adequate labeling for drug’s off-label use). Thus, the government has treated promotional speech as more than merely evidence of a drug’s intended use — it has construed the FDCA to prohibit promotional speech as misbranding itself.
2. The Facts [4]

a.Orphan Medical and Xyrem

Orphan Medical, Inc. (“Orphan”), now known as Jazz Pharmaceutical, was a Delaware-incorporated pharmaceutical company that primarily developed drugs to treat pain, sleep disorders, and central nervous system disorders. Orphan manufactured the drug Xyrem, a powerful central nervous system depressant. In 2005, after Jazz Pharmaceuticals acquired Orphan, Jazz continued to manufacture and sell Xyrem, grossing $20 million in combined Xyrem sales in 2005.
Xyrem can cause serious side effects, including difficulty breathing while asleep, confusion, abnormal thinking, depression, nausea, vomiting, dizziness, headache, bedwetting, and sleepwalking. If abused, Xyrem can cause additional medical problems, including seizures, dependence, severe withdrawal, coma, and death.
Xyrem’s active ingredient is gamma-hy-droxybutryate (“GHB”). GHB has been federally classified as the “date rape drug” for its use in the commission of sexual assaults.
b. The FDA’s Regulation of Xyrem
Despite the risks associated with Xyrem and GHB, the FDA approved Xyrem for two medical indications. In July 2002, the FDA approved Xyrem to treat narcolepsy patients who experience cataplexy, a condition associated with weak or paralyzed muscles. In November 2005, the FDA approved Xyrem to treat narcolepsy patients with excessive daytime sleepiness (“EDS”), a neurological disorder caused by the brain’s inability to regulate sleep-wake cycles.
To protect against its serious safety concerns, in 2002, the FDA required a “black box” warning to accompany Xyrem. The black box warning is the most serious warning placed on prescription medication labels. Xyrem’s black box labeling stated, among other things, that the drug’s safety and efficacy were not established in patients under 16 years of age, and the drug had “very limited” experience among elderly patients.
To identify patients suffering side effects from the drug, the FDA also regulated Xyrem distribution, allowing only one centralized Missouri pharmacy to distribute Xyrem nationally.
c. Caronia’s Employment with Orphan
In March 2005, Orphan hired Caronia as a Specialty Sales Consultant to promote *156 Xyrem. Caronia primarily worked in Queens, Nassau, and Suffolk counties. Caronia’s salary was based on his individual sales.
In July 2005, Caronia started Orphan’s “speaker programs” for Xyrem. Speaker programs enlist physicians, for pay, to speak to other physicians about FDA-approved drug use. Orphan’s speaker programs for Xyrem presented the benefits of the drug among patients with cataplexy and narcolepsy. Orphan hired Dr. Peter Gleason to promote Xyrem through its speaker programs.
Under Orphan’s procedures, if Caronia, as a sales consultant for Xyrem, was asked about the off-label use of Xyrem, he was not permitted to answer; instead, when such questions were posed, Orphan sales consultants would fill out “medical information request forms” and send them to Orphan, and Orphan would send information to the inquiring physician.[5] In contrast, physicians employed by Orphan as promotional speakers for Xyrem were permitted to answer off-label use questions; their responses were often informed by their own experiences with Xyrem.
d. Caronia’s Participation in the Conspiracy
In the spring of 2005, the federal government launched an investigation of Orphan and Gleason. The investigation focused on the off-label promotion of Xyrem. Caronia and Gleason were audio-recorded on two occasions as they promoted Xyrem for unapproved uses, including unapproved indications and unapproved subpopula-tions. The first conversation was recorded on October 26, 2005 between Caronia and Dr. Stephen Charno, a physician who, as a government cooperator, posed as a prospective Xyrem customer. The second conversation was recorded on November 2, 2005; it taped a meeting arranged by Ca-ronia to introduce Charno to Gleason.
On October 26, 2005, Caronia plainly promoted the use of Xyrem in unapproved indications with Charno:
[Caronia]: And right now the indication is for narcolepsy with cataplexy ... excessive daytime ... and fragmented sleep, but because of the properties that ... it has it’s going to insomnia, Fibro-myalgia[,] periodic leg movement, restless leg, ahh also looking at ahh Parkinson’s and ... other sleep disorders are underway such as MS.
[Charno]: Okay, so then so then it could be used for muscle disorders and chronic pain and ...
[Caronia]: Right.
[Charno]: ... and daytime fatigue and excessive sleepiness and stuff like that?
[Caronia]: Absolutely. Absolutely.
Ahh with the Fibromyalgia.
(October 26, 2005 Recording Tr. (I) at 4-5). Caronia further directed Charno to list different “diagnosis codes” when prescribing Xyrem, for insurance purposes, including Fibromyalgia, chronic fatigue, or chronic pain.
On separate occasions, Caronia and Gleason each explained to prospective physician-customers that Xyrem could be used with patients under age sixteen, an unapproved Xyrem subpopulation:
[Caronia]: Um, the youngest patients we have are sixteen in the studies as old as sixty-five. Ahh there have been re *157 ports of patients as young as fourteen using it and obviously greater than sixty-five. It’s a very safe drug.
(October 26, 2005 Recording Tr. (I) at 7).
[Gleason]: Well, it’s actually approved for sixteen and above um, I’ve had people under thirteen and I’ve certainly talked to neurologists that have narco-leptics ... between eight and ten ... [but] I start at two-thirds the dose, but [if] they’re real frail I only start with one-third the dose.
(November 2, 2005 Recording Tr. (II) at 51).
3. Proceedings Below
a. The Charges
On July 25, 2007, a grand jury returned its first Indictment against Caronia. The charging document at issue on this appeal, however, is the Superseding Information filed by the government on August 19, 2008, which charged Caronia with the following two misdemeanor offenses:
Count One: Conspiracy to introduce a misbranded drug into interstate commerce in violation of 21 U.S.C. §§ 331(a) and 333(a)(2); and
Count Two: Introducing a misbranded drug, Xyrem, into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).
(InfiliH 12-17).
With respect to Count One, the Information alleged a two-prong conspiracy. The first prong charged that between approximately March 2005 and March 2006, Caro-nia, “together with others, did knowingly and intentionally conspire to” introduce Xyrem and cause the introduction of Xy-rem into interstate commerce when Xyrem was misbranded within the meaning of the FDCA. (Inf.1l 13). The second prong alleged that “[i]t was part of the conspiracy that [Caronia], together with others, marketed Xyrem for medical indications that were not approved by [the] FDA when, as [they] ... well knew and believed, Xy-rem’s labeling lacked adequate directions for and warnings against such uses, where such uses could be dangerous to the user’s health.” (Inf.1114).
The Information alleged, in Count One, that Caronia, “together with others, committed and caused to be committed,” the following two overt acts. (Inf.1115).
a. On or about October 26th, 2005, ... Caronia promoted Xyrem to [Char-no], a physician, so as to cause [Charno] to prescribe Xyrem for fi-bromyalgia, excessive daytime sleepiness, muscle disorders, chronic pain and fatigue, which were “off-label” indications.
b. On or about November 2, 2005, ... Caronia introduced [Charno] to [Gleason], a physician, who was paid by Orphan and whom Orphan used to promote Xyrem for “off-label” indications, including fibromyalgia, excessive daytime sleepiness, weight loss and chronic fatigue.
(Inf.1T1f 15(a), (b)).
With respect to Count Two, the Information alleged that between approximately March 2005 and March 2006, Caronia “was marketing Xyrem for medical indications that were not approved by [the] FDA when, as the defendant then and there well knew and believed, Xyrem’s labeling lacked adequate directions for such uses and adequate warnings against such uses where uses could be dangerous to the user’s health.” (Infill 17).
Additionally, the Information alleged: “A drug that was marketed to the public for an ‘off-label’ indication or use did not contain ‘adequate directions for use’ because such an ‘off-label’ indication or use and related information were not included *158 in the FDA-approved labeling for the drug.” (Inf-¶ 8). The Information further stated: “Xyrem’s labeling lacked adequate directions for such uses and adequate warnings against such uses where such uses could be dangerous to the user’s health.” (Inf.lN 14,17).
Orphan and Gleason were also charged under the misbranding provisions of the FDCA; both pled guilty. United States v. Caronia, 576 F.Supp.2d at 389-90 & n. 1.
b. Caronia’s Pre-Trial Motion to Dismiss
On October 9, 2007, before trial, Caronia moved to dismiss the charges against him. In part, Caronia argued that the application of the FDCA’s misbranding provisions to his off-label promotional statements unconstitutionally restricted his right to free speech under the First Amendment and that the provisions were unconstitutionally vague and broad.
On September 11, 2008, the district court denied Caronia’s motion, including his First Amendment challenge, which it recognized as raising constitutional issues “very much unsettled, not only in this circuit but nationwide.” Id. at 403. Although ruling for the government, the district court rejected the government’s argument that Caronia was being prosecuted for the unlawful conduct of mis-branding and conspiring to misbrand a drug and not for his promotional speech, the latter of which the government contended only constituted proof of Xyrem’s intended use. See id. at 394-95. The court observed that “the criminal information ... allege[d] Caronia’s promotion of off-label uses of an FDA-approved drug,” and concluded that Caronia stood charged with a crime the actus reus of which was First Amendment speech. Id. at 395. Nevertheless, the district court held that, to the extent the FDCA criminalizes speech, the law passed constitutional muster under the commercial speech doctrine because the FDCA was not more extensive than necessary to achieve the FDA’s objectives. Id. at 401-02.
c. The Tidal
The case was tried before a jury from October 6 to October 16, 2008.
The record makes clear that the government prosecuted Caronia for his off-label promotion, in violation of the FDCA. The government, in its summation and rebuttal, repeatedly asserted that Caronia was guilty because he, with others, conspired to promote and market Xyrem for off-label use. For example, the government argued:
• “[Caronia is] promoting, he’s marketing a dangerous drug for use not approved by the FDA” (id. at 825);
• “He knew the rules: you can’t promote and market Xyrem for uses that have not been approved by the FDA. He admits it” (id. at 839);
• “[Caronia] conspired through some act of misbranding, and that act of mis-branding ... was the promotion on October 26th and November 2nd[,] marketing [a] drug for unapproved uses” (id. at 848);
• “That’s misbranding. That’s promoting and marketing a drug by a pharmaceutical company representative for muscle disorders, chronic pain, daytime fatigue, excessive sleepiness” (id. at 870); and
• “[Caronia was] promoting, promoting, selling, selling, trying to get Charno to prescribe Xyrem. He tried on the 26th. He tried with Gleason on the 2nd” (id. at 875).[6]
*159 Thus, the government’s theory of prosecution identified Caronia’s speech alone as the proscribed conduct.
The district court, in its jury charge, reinforced the idea that Caronia’s promotional speech was enough to support a guilty verdict:
A misbranded drug may be shown by a promotion of the drug by a distributor for an intended use different from the use for which the drug was approved by the [FDA],
The manufacturer, its agents, representatives and employees, are not permitted to promote uses for a drug that have not been cleared by the United States Food and Drug Administration. These non-cleared uses are commonly referred to as ‘off-label uses’ because they are not included in the drug’s labeling.
(Trial Tr. 920-21).
Prior to jury deliberation, the district court provided a proposed verdict sheet to the parties. With respect to Count One, the verdict sheet read as follows:
1. How do you find defendant, ALFRED CARONIA, on Count One of the Information?
(a) Conspiracy to introduce or deliver for introduction into interstate commerce a drug, Xyrem, that was mis-branded?
NOT GUILTY_GUILTY_
(b) Conspiracy to do an act with respect to a drug, Xyrem, when such drug was held for sale after shipment in interstate commerce when such act would result in Xyrem being misbranded?
NOT GUILTY_GUILTY_
(Verdict Sheet, ECF Doc. No. 103, United States v. Caronia, No. 06 Cr. 229 (E.D.N.Y. Oct. 23, 2008)). The district court overruled Caronia’s objection that the verdict sheet was erroneous and therefore permitted the jury to reach an inconsistent verdict.
On October 23, 2008, the jury found Caronia guilty as to the first prong of Count One of the Information (Question 1(a)): conspiracy to introduce a misbrand-ed drug into interstate commerce under 18 U.S.C. § 371(a) and 21 U.S.C. § 331(a). As to the second marketing prong of Count One (Question 1(b)), the jury found Caronia not guilty. The jury also found Caronia not guilty of Count Two of the Information.
d. Caronia’s Post-Trial Motion for Acquittal
After the jury verdict and before judgment was entered, Caronia renewed his Rule 29 motion for acquittal. See Fed. R.Crim.P. 29. On December 13, 2008, af *160 ter briefing, the district court denied the motion.
e. Caronia’s Sentence
On November 30, 2009, the district court sentenced Caronia to one year of probation, 100 hours of community service, and a $25 special assessment.
This appeal followed.

DISCUSSION

On appeal, Caronia principally argues that the misbranding provisions of the FDCA prohibit off-label promotion, and therefore, unconstitutionally restrict speech.[7] Caronia argues that the First Amendment does not permit the government to prohibit and criminalize a pharmaceutical manufacturer’s truthful and non-misleading promotion of an FDA-approved drug to physicians for off-label use where such use is not itself illegal and others are permitted to engage in such speech.
We review Caronia’s First Amendment challenge to his conspiracy conviction de novo. See Conn. Bar Ass’n v. United States, 620 F.3d 81, 89 (2d Cir.2010) (“We review constitutional challenges to a federal statute de novo.”); see also United States v. Dhafir, 461 F.3d 211, 215 (2d Cir.2006) (same). We agree that Caronia’s conviction must be vacated, but for narrower reasons than he urges.
While the FDCA makes it a crime to misbrand or conspire to misbrand a drug, the statute and its accompanying regulations do not expressly prohibit or criminalize off-label promotion. See supra 153-55. Rather, the FDCA and FDA regulations reference “promotion” only as evidence of a drug’s intended use. See 21 C.F.R. § 201.128 (discussing how drug’s intended use can be demonstrated). Thus, under the principle of constitutional avoidance, explained infra, we construe the FDCA as not criminalizing the simple promotion of a drug’s off-label use because such a construction would raise First Amendment concerns. Because we conclude from the record in this case that the government prosecuted Caronia for mere off-label promotion and the district court instructed the jury that it could convict on that theory, we vacate the judgment of conviction.
We begin by addressing the government’s contention that Caronia’s off-label promotion was used only as evidence of intent in this case. Finding the government’s argument unpersuasive, we turn to the principal question on appeal: whether the government’s prosecution of Caronia under the FDCA only for promoting an FDA-approved drug for off-label use was constitutionally permissible.
I. Speech versus Evidence of Intent
The government contends—and the dissent agrees—that the First Amendment is not implicated in this case. Specifically, the government argues that “[promoting an approved drug for off-label uses is not itself a prohibited act under the FDCA” and “the promotion of off-label uses plays an evidentiary role in determining whether a drug is misbranded under 21 U.S.C. § 352(f)(1).” (Gov’t Br. 51 (citing 21 U.S.C. § 331)). The government contends that Caronia was not prosecuted for his speech, but that Caronia’s promotion of Xyrem for off-label use served merely as “evidence of intent,” or evidence that the “off-label uses were intended ones[] for which Xyrem’s *161 labeling failed to provide any directions.” (Gov’t Br. 52).
Even assuming the government can offer evidence of a defendant’s off-label promotion to prove a drug’s intended use and, thus, mislabeling for that intended use,[8] that is not what happened in this case.
First, the government’s contention that it did not prosecute Caronia for promoting the off-label use of an FDA-approved drug is belied by its conduct and arguments at trial. The excerpts quoted above demonstrate that the government repeatedly argued that Caronia engaged in criminal conduct by promoting and marketing the off-label use of Xyrem, an FDA-approved drug. See supra 158-59 & n. 7. The district court record thus confirms overwhelmingly that Caronia was, in fact, prosecuted and convicted for promoting Xyrem off-label. See supra 155-60. Indeed, in the government’s summation and rebuttal at trial, Caronia’s off-label promotion of Xyrem is highlighted over forty times. (See Trial Tr. 819-49, 870-80, 888-85).
Second, the government’s assertion now that it used Caronia’s efforts to promote Xyrem for off-label use only as evidence of intent is simply not true. Even if the government could have used Caronia’s speech as evidence of intent, the district court record clearly shows that the government did not so limit its use of that evidence. See Mitchell, 508 U.S. at 489-90, 113 S.Ct. 2194 (instructing that, when speech is introduced as evidence of intent, “ ‘[s]uch testimony is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government’” (quoting Haupt v. United States, 330 U.S. 631, 642, 67 S.Ct. 874, 91 L.Ed. 1145 (1947))). The government never argued in summation or rebuttal that the promotion was evidence of intent. (See Trial Tr. 819^9, 870-80, 883-85). The government never suggested that Caronia engaged in any form of misbranding other than the promotion of the off-label use of an FDA-approved drug. The government never suggested, for example, that Caronia conspired to place false or deficient labeling on a drug. See 21 U.S.C. § 352(a)-(n). Rather, the record makes clear that the government prosecuted Caronia for his promotion and marketing efforts.
Third, the government’s summation and the district court’s instruction left the jury to understand that Caronia’s speech was itself the proscribed conduct. See supra 158-59. Indeed, the district court flatly stated to the jury that pharmaceutical representatives are prohibited from engaging in off-label promotion. See id. Although the district court explained the remaining elements of misbranding and conspiring to misbrand to the jury, this specific instruction — together with the government’s summation — would have led the jury to believe that Caronia’s promotional speech was, by itself, determinative of his guilt. See generally United States v. Dyer, 922 F.2d 105, 107-08 (2d Cir.1990) (stating specific jury instruction may be reviewed in isolation if “it is so far removed from the standards set by the law that the appellate court is convinced that the jury might have been misled” (internal quotation marks omitted)).
Fourth, the government clearly prosecuted Caronia for his words — for his speech. A pharmaceutical representative’s promotion of an FDA-approved drug’s off-label use is speech. As the Supreme *162 Court has held: “Speech in aid of pharmaceutical marketing ... is a form of expression protected by the Free Speech Clause of the First Amendment.” Sorrell v. IMS Health, Inc., — U.S. -, 131 S.Ct. 2653, 2659, 180 L.Ed.2d 544 (2011). Here, the proscribed conduct for which Caronia was prosecuted was precisely his speech in aid of pharmaceutical marketing.
Accordingly, we conclude that the government did prosecute Caronia for his speech, and we turn to whether the prosecution was permissible.
II. The Prosecution of Caronia’s Speech
While the government and the FDA have construed the FDCA’s misbranding provisions to prohibit off-label promotion by pharmaceutical manufacturers, see supra 154-55; see FDA, Draft Guidance, supra, at 2-3, as we have observed, the FDCA itself does not expressly prohibit or criminalize off-label promotion. See supra 153-55. The FDCA defines misbranding in terms of whether a drug’s labeling is adequate for its intended use, and permits the government to prove intended use by reference to promotional statements made by drug manufacturers or their representatives. See id. Assuming that this approach to the use of evidence of speech is permissible,[9] it affords little support to the government on this appeal because Caro-nia was not prosecuted oh this basis. Rather, the government’s theory of prosecution identified Caronia’s speech alone as the proscribed conduct. The district court accepted this theory.
To the extent there is any ambiguity as to whether off-label promotion is tantamount to illegal misbranding, we construe the FDCA narrowly to avoid a serious constitutional question. See Skilling v. United States, — U.S. -, 130 S.Ct. 2896, 2929-30, 177 L.Ed.2d 619 (2010) (instructing courts to “avoid constitutional difficulties by adopting a limiting interpretation if such a construction is fairly possible” (internal quotation marks and brackets omitted)); Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); Allstate Ins. Co. v. Serio, 261 F.3d 143, 150 (2d Cir.2001) (“Thus, the courts will take pains to give a statute a limiting construction in order to avoid a constitutional difficulty.”).
As we now explain, we decline the government’s invitation to construe the FDCA’s misbranding provisions to criminalize the simple promotion of a drug’s off-label use by pharmaceutical manufacturers and their representatives because such a construction — and a conviction obtained under the government’s application of the FDCA — would run afoul of the First Amendment.
A. Applicable First Amendment Doctrine
The First Amendment protects against government regulation and sup *163 pression of speech on account of its content. Turner Broad. System, Inc. v. F.C.C., 512 U.S. 622, 641-42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); see Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); R.A.V. v. City of St. Paul, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Content-based speech restrictions are subject to “strict scrutiny” — that is, the government must show that the regulation at issue is narrowly tailored to serve or promote a compelling government interest. See Brown v. Entm’t Merchs. Ass’n, - U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (citing R.A.V., 505 U.S. at 395, 112 S.Ct. 2538). Content-based government regulations are “presumptively invalid.” R.A.V., 505 U.S. at 382, 112 S.Ct. 2538. Meanwhile, non-content-based regulation and regulation of commercial speech — expression solely related to the economic interests of the speaker and its audience — are subject to intermediate scrutiny. See Turner Broad., 512 U.S. at 642, 114 S.Ct. 2445; Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 563-64, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Criminal regulatory schemes, moreover, warrant even more careful scrutiny. See Holder v. Humanitarian Law Project, — U.S. -, 130 S.Ct. 2705, 2724, 177 L.Ed.2d 355 (2010) (applying more rigorous scrutiny); id. at 2734 (Breyer, /., dissenting) (“It is not surprising that the majority, in determining the constitutionality of criminally prohibiting the plaintiffs’ proposed activities, would apply ... a more demanding standard. Indeed, where, as here, a statute applies criminal penalties ... I should think we would scrutinize the statute and justifications strictly.” (internal quotation marks and citations omitted) (citing cases)); see also City of Houston v. Hill, 482 U.S. 451, 459, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (“Criminal statutes must be scrutinized with particular care.” (internal citations omitted)).
In applying these principles, we have a benefit not available to the district court: the Supreme Court’s decision in Sorrell v. IMS Health, Inc., — U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), a case involving speech restrictions on pharmaceutical marketing. In Sorrell, the Vermont Prescription Confidentiality Law (the “VPCL”) prohibited pharmaceutical companies and similar entities from using prescriber-identifying information for marketing purposes; it was challenged on First Amendment grounds. Id. at 2661-62; see also Vt. Stat. Ann., Tit. 18 § 4631(e)(4).
The Sorrell Court held that “[sjpeech in aid of pharmaceutical marketing ... is a form of expression protected by the ... First Amendment.... [The] creation and dissemination of information are speech within the meaning of the [Constitution].” Id. at 2659, 2667. The Court held that the Vermont statute set forth content- and speaker-based restrictions, and that the statute was therefore subject to heightened scrutiny. Id. at 2662-65. Because the VPCL disfavored speech with a particular content (marketing) when expressed by certain disfavored speakers (pharmaceutical manufacturers), the Court held that it unconstitutionally restricted speech. Id. at 2662-65, 2672.
In reaching this conclusion, Sor-rell engaged in a two-step inquiry. First, the Court considered whether the government regulation restricting speech was content- and speaker-based. See id. at 2662-64. The Court held that it was; the regulation was therefore subject to heightened scrutiny and was “presumptively invalid.” See id. Second, the Court considered whether the government had shown that the restriction on speech was consis *164 tent with the First Amendment under the applicable level of heightened scrutiny. Id. at 2663, 2667-68. The Court did not decide the level of heightened scrutiny to be applied, that is, strict, intermediate, or some other form of heightened scrutiny. Id. Rather, after observing that “[i]n the ordinary case, it is all but dispositive to conclude that a law is content-based,” the Court concluded that the Vermont statute was unconstitutional even under the lesser intermediate standard set forth in Central Hudson. Id. at 2667; see Cent. Hudson, 447 U.S. at 566,100 S.Ct. 2343. The Court further observed that the “outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.” Sorrell, 131 S.Ct. at 2667.
In considering whether the government had shown that the restriction on speech was consistent with the First Amendment, the Sorrell Court turned to Central Hudson. See id. at 2667-68. Central Hudson sets forth a four-part test to determine whether commercial speech is protected by the First Amendment. Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. First, as a threshold matter, to warrant First Amendment protection, the speech in question must not be misleading and must concern lawful activity. Id.; see infra note 11 and accompanying text. Second, to justify regulations restricting speech, the asserted government interest must be substantial. Id. Third, the regulation must directly advance the governmental interest asserted, id., “to a material degree,” 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 505, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (quoting Edenfield v. Fane, 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)). “[A] commercial speech regulation ‘may not be sustained if it provides only ineffective or remote support for the government’s purpose.’ ” Liquormart, 517 U.S. at 505, 116 S.Ct. 1495 (quoting Cent., 447 U.S. at 564, 100 S.Ct. 2343). Fourth, the regulation must be “narrowly drawn,” and may not be more extensive than necessary to serve the interest, Cent. Hudson, 447 U.S. at 565-66, 100 S.Ct. 2343; see also Sorrell, 131 S.Ct. at 2667-69 (citing Bd. of Tr. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480-81, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)); Thompson v. W. States Med. Ctr., 535 U.S. 357, 374, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). The government cannot “completely suppress information when narrower restrictions on expression would serve its interests as well.” Cent. Hudson, 447 U.S. at 565, 100 S.Ct. 2343. “Under the commercial speech inquiry, it is the [government’s] burden to justify its content-based law as consistent with the First Amendment.” Sorrell, 131 S.Ct. at 2667 (citing Thompson, 535 U.S. at 373, 122 S.Ct. 1497).
B. Application
In prosecuting Caronia, the government construed the FDCA’s misbranding provisions to prohibit and criminalize the promotion of off-label drug use. We review the government’s theory of prosecution under the Sorrell Court’s two-step analysis to determine whether it runs afoul of the First Amendment. First, we conclude that the government’s construction of the FDCA’s misbranding provisions imposes content- and speaker-based restrictions on speech subject to heightened scrutiny. Second, we conclude the government cannot justify a criminal prohibition of off-label promotion even under Central Hudson’s less rigorous intermediate test.
1. Heightened Scrutiny
The government’s construction of the FDCA’s misbranding provisions to prohibit and criminalize the promotion of off-label drug use by pharmaceutical man *165 ufacturers is content- and speaker-based, and, therefore, subject to heightened scrutiny. See id.
First, the government’s interpretation of the FDCA’s misbranding provisions to prohibit off-label promotion is content-based because it distinguishes between “favored speech” and “disfavored speech on the basis of the ideas or views expressed.” See Turner Broad., 512 U.S. at 643, 114 S.Ct. 2445; accord Sorrell, 131 S.Ct. at 2663. Under this construction, speech about the government-approved use of drugs is permitted, while certain speech about the off-label use of drugs— that is, uses not approved by the government — is prohibited, even though the off-label use itself is not. See 21 U.S.C. §§ 331(a), 333(a)(2). Indeed, the content of the regulated speech drives this construction of the FDCA; as in Sorrell, the “express purpose and practical effect” of the government’s ban on promotion is to “diminish the effectiveness of [off-label drug] marketing by manufacturers.” See Sorrell, 131 S.Ct. at 2663.
Second, this construction is speaker-based because it targets one kind of speaker — pharmaceutical manufacturers— while allowing others to speak without restriction. See id. at 2663. In Sorrell, pharmaceutical companies were barred from obtaining and using prescriber-iden-tifying information for marketing purposes, but a wide range of other speakers, including private and academic researchers, could acquire and use the information. Id. Similarly, here, because off-label prescriptions and drug use are legal, the government’s application of the FDCA permits physicians and academics, for example, to speak about off-label use without consequence, while the same speech is prohibited when delivered by pharmaceutical manufacturers. See 21 U.S.C. §§ 331(a), 333(a). This construction “thus has the effect of preventing [pharmaceutical manufacturers] — and only [pharmaceutical manufacturers] — from communicating with physicians in an effective and informative manner.” Sorrell, 131 S.Ct. at 2663.
Additionally, a claim to First Amendment protection here is more compelling than in Sorrell because this case involves a criminal regulatory scheme subject to more careful scrutiny. See 21 U.S.C. § 333(a); Humanitarian Law Project, 130 S.Ct. at 2724.
Accordingly, the government’s construction of the FDCA’s misbranding provisions to prohibit and criminalize off-label promotion is content- and speaker-based, and subject to heightened scrutiny under Sor-rell.
2. Central Hudson
The first two prongs of Central Hudson are easily satisfied here. First, promoting off-label drug use concerns lawful activity (off-label drug use), and the promotion of off-label drug use is not in and of itself false or misleading.[10] See *166 Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. Second, the government’s asserted interests in drug safety and public health are substantial. See id. Specifically, the government asserts an interest in preserving the effectiveness and integrity of the FDCA’s drug approval process, and an interest in reducing patient exposure to unsafe and ineffective drugs. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (“[0]ne of the [FDCA’s] core objectives is to ensure that any product regulated by the FDA is ‘safe’ and ‘effective’ for its intended use.”).
The third and fourth prongs of Central Hudson require that the regulation directly advance the government’s interests and be narrowly drawn. See Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. We turn to the third and fourth prongs below.
a. Direct Advancement
The government’s construction of the FDCA as prohibiting off-label promotion does not, by itself, withstand scrutiny under Central Hudson’s third prong. First, off-label drug usage is not unlawful, and the FDA’s drug approval process generally contemplates that approved drugs will be used in off-label ways. In effect, even if pharmaceutical manufacturers are barred from off-label promotion, physicians can prescribe, and patients can use, drugs for off-label purposes. See supra 152-54. As off-label drug use itself is not prohibited, it does not follow that prohibiting the truthful promotion of off-label drug usage by a particular class of speakers would directly further the government’s goals of preserving the efficacy and integrity of the FDA’s drug approval process and reducing patient exposure to unsafe and ineffective drugs. See Sorrell, 131 S.Ct. at 2668-69 (holding government interest in protecting physician privacy not directly served when law made preseriber-identifying information available to “all but a narrow class of disfavored speakers”).
Second, prohibiting off-label promotion by a pharmaceutical manufacturer while simultaneously allowing off-label use “pa-ternalistically” interferes with the ability of physicians and patients to receive potentially relevant treatment information; such barriers to information about off-label use could inhibit, to the public’s detriment, informed and intelligent treatment decisions. See Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (discussing “highly paternalistic approach” of government prohibitions on free flow of information); see also Sorrell, 131 S.Ct. at 2670-72 (“ ‘[The] fear that [physicians, sophisticated and experienced customers,] would make bad decisions if given truthful information’ cannot justify content-based burdens on speech.”) (citing sources); Li-quormart, 517 U.S. at 503, 116 S.Ct. 1495 (“[B]ans against truthful, nonmisleading commercial speech ... usually rest solely on the offensive assumption that the public will respond ‘irrationally’ to the truth.... The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.”). In fact, in granting safe harbor to manufacturers by permitting the dissemi *167 nation of off-label information through scientific journals, the FDA itself “recognizes that public health can be served when health care professionals receive truthful and non-misleading scientific and medical information on unapproved uses” of approved drugs. Dep’t of Health and Human Serv., Good Reprint Practices, supra, at III, V; see Wash. Legal Found, v. Hen-ney, 202 F.3d 331, 335 (D.C.Cir.2000) (discussing FDA “safe harbor,” where certain forums for off-label discussion, such as continuing medical education programs and scientific publications, would not be used against manufacturers in misbrand-ing enforcement actions).
Here, as the FDA recognizes, it is the physician’s role to consider multiple factors, including a drug’s FDA-approval status, to determine the best course of action for her patient. See FDA Drug Bull., supra, at 5; Buckman, 531 U.S. at 350, 121 S.Ct. 1012; Weaver, 886 F.2d at 198-99; 21 U.S.C. § 396; see also Thompson, 535 U.S. at 367, 122 S.Ct. 1497 (discussing the “general rule” that “the speaker and the audience, not the government, assess the value of the information presented”) (quoting Edenfield, 507 U.S. at 767, 113 S.Ct. 1792); see also Va. Bd. of Pharmacy, 425 U.S. at 770, 96 S.Ct. 1817 (“[T]he choice ... is not ours to make or the [legislature’s].”). While some off-label information could certainly be misleading or unhelpful, this case does not involve false or misleading promotion. See supra note 11. Moreover, in the fields of medicine and public health, “where information can save lives,” it only furthers the public interest to ensure that decisions about the use of prescription drugs, including off-label usage, are intelligent and well-informed. See Sorrell, 131 S.Ct. at 2664, 2671; Thompson, 535 U.S. at 366, 122 S.Ct. 1497 (quoting Va. Bd. of Pharmacy, 425 U.S. at 765, 96 S.Ct. 1817).
The government’s construction of the FDCA essentially legalizes the outcome— off-label use — but prohibits the free flow of information that would inform that outcome. If the government’s objective is to shepherd physicians to prescribe drugs only on-label, criminalizing manufacturer promotion of off-label use while permitting others to promote such use to physicians is an indirect and questionably effective means to achieve that goal. Thus, the government’s construction of the FDCA’s misbranding provisions does not directly advance its interest in reducing patient exposure to off-label drugs or in preserving the efficacy of the FDA drug approval process because the off-label use of such drugs continues to be generally lawful. Accordingly, the government’s prohibition of off-label promotion by pharmaceutical manufacturers “provides only ineffective or remote support for the government’s purpose.” See Liquormart, 517 U.S. at 504-05, 116 S.Ct. 1495 (quoting Cent. Hudson, 447 U.S. at 564, 100 S.Ct. 2343).
b. Narrowly Drawn
The last prong of Central Hudson requires the government’s regulation to be narrowly drawn to further the interests served. Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. Here, the government’s construction of the FDCA to impose a complete and criminal ban on off-label promotion by pharmaceutical manufacturers is more extensive than necessary to achieve the government’s substantial interests. See id. Numerous, less speech-restrictive alternatives are available, as are non-criminal penalties. See Thompson, 535 U.S. at 372-73, 122 S.Ct. 1497.
To advance the integrity of the FDA’s drug approval process and increase the safety of off-label drug use, the government could pursue several alternatives without excessive First Amendment re *168 strictions. See Cent. Hudson, 447 U.S. at 564, 100 S.Ct. 2343. For example, if the government is concerned about the use of drugs off-label, it could more directly address the issue. If the government is concerned that off-label promotion may mislead physicians, it could guide physicians and patients in differentiating between misleading and false promotion, exaggerations and embellishments, and truthful or non-misleading information. See Osborn, Can I Tell You The Truth?, supra, at 306-07. The government could develop its warning or disclaimer systems, or develop safety tiers within the off-label market, to distinguish between drugs. See Coleen Klasmeier and Martin H. Redish, Off-Label Prescription Advertising, the FDA and the First Amendment: A Study in the Values of Commercial Speech Protection, 37 Am. J.L. & Med. 315, 334 (2011). The government could require pharmaceutical manufacturers to list all applicable or intended indications when they first apply for FDA approval, enabling physicians, the government, and patients to track a drug’s development. To minimize off-label use, or manufacturer evasion of the approval process for such use, the government could create other limits, including ceilings or caps on off-label prescriptions. The FDA could further remind physicians and manufacturers of, and even perhaps further regulate, the legal liability surrounding off-label promotion and treatment decisions.[11] Finally, where off-label drug use is exceptionally concerning, the government could prohibit the off-label use altogether. See, e.g., Bader, 678 F.3d at 873-75 & n. 10 (citing 21 U.S.C. § 333(e) (prohibiting off-label use of human growth hormone)). The possibilities are numerous indeed.
“If the First Amendment means anything, it means that regulating speech must be a last — not first — resort.” Thompson, 535 U.S. at 373, 122 S.Ct. 1497. The government has not established a “reasonable fit” among its interests in drug safety and public health, the lawfulness of off-label use, and its construction of the FDCA to prohibit off-label promotion. See Fox, 492 U.S. at 480, 109 S.Ct. 3028. The government’s interests could be served equally well by more limited and targeted restrictions on speech. See Cent. Hudson, 447 U.S. at 565, 100 S.Ct. 2343. The government contends that these alternative means of reducing patient exposure to unsafe, untested drugs and maintaining the integrity of the FDA-approval process are “indefensible” (Gov’t Br. 70), because they are not administrable, feasible, or otherwise effective. In the absence of any support, such conclusory assertions are insufficient to sustain the government’s burden of demonstrating that the proposed alternatives are less effective than its proposed construction of the FDCA in furthering the government interests identified. See Ashcroft v. ACLU, 542 U.S. 656, 665, 669, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004).
Accordingly, even if speech can be used as evidence of a drug’s intended use, we decline to adopt the government’s construction of the FDCA’s misbranding provisions to prohibit manufacturer promotion alone as it would unconstitutionally restrict free speech. We construe the misbrand-ing provisions of the FDCA as not prohibiting and criminalizing the truthful off-label promotion of FDA-approved prescription drugs. Our conclusion is limited *169 to FDA-approved drugs for which off-label use is not prohibited, and we do not hold, of course, that the FDA cannot regulate the marketing of prescription drugs. We conclude simply that the government cannot prosecute pharmaceutical manufacturers and their representatives under the FDCA for speech promoting the lawful, off-label use of an FDA-approved drug.

CONCLUSION

For the reasons set forth above, we VACATE the judgment of conviction and REMAND the case to the district court.

. The FDCA provides: "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.” 21 U.S.C. § 355(a). A "new drug” is defined as: "Any drug ... not generally recognized ... as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p).

. See also James M. Beck & Elizabeth D. Azari, FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 Food & Drug LJ. 71, 76-77 (1998); cf. 21 U.S.C. § 396 (protecting physician authority to prescribe or administer any legally-marketed device to patient).

. A drug is also misbranded if, inter alia: its label is false or misleading; the label fails to display required information prominently; its container is misleading; or it is dangerous to health when used in the dosage, manner, frequency, or duration prescribed, recommended, or suggested on the label. See 21 U.S.C. §§ 352(a)-(n).

. The facts are drawn primarily from the trial record. On appeal, this Court must view the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor. See United States v. Amico, 486 F.3d 764, 780 (2d Cir.2007).

. In December of 2011, the FDA released recommendations for the pharmaceutical industry with respect to how manufacturers and their representatives can respond to “unsolicited requests for off-label information.” See generally U.S. Food and Drug Administration, Guidance for Industry, Responding to Unsolicited Requests for Off-Label Infoimation About Prescription Drugs and Medical Devices (2011).

. The government’s summation and rebuttal include numerous additional examples of the *159 government’s assertion that Caronia was guilty because he conspired to promote and market Xyrem for unapproved uses. (See, e.g., Trial Tr. 834 ("On November 2nd ... Gleason, comes in to pitch to [Charno] and he right away goes off-label, promotes and markets Xyrem for uses that are not approved by the FDA, clear as a bell."); id. ("[Caronia is] misbranding. He's promoting a drug, Xyrem, that's dangerous for unapproved uses.”); id. at 836 ("[H]e crossed the line and here’s the labeling and you can only promote Xyrem for cataplexy associated with narcolepsy and you can’t do it for anything else."); id. at 847 ("The conspiracy is promoting it and then trying to persuade through off-label communications to get Charno to write prescriptions off-label”); id. at 883 ("And the facts are one prong the drug was promoted for unapproved uses in a meeting with Charno on the 26th of October and the 2nd of November with the expectation or with the effort or with the attempt or with the conspiracy that by promoting it for off-label use, Charno would write a prescription and cause the drug to be shipped from St. Louis to some patient out of state.”); see also id. at 821-22, 827, 829, 840-43, 847-48, 872-74, 878).

. Caronia also argues that the verdict sheet was improperly phrased and the jury's verdict was inconsistent. In light of our disposition of the First Amendment issue, we need not reach these issues.

. See Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (concluding First Amendment "does not prohibit the use of speech to establish ... intent”); Whitaker v. Thompson, 353 F.3d 947, 953 (D.C.Cir.2004) (holding product’s labeling may be used to infer its intended use and, thus, whether it is an unapproved drug under FDCA).

. Although we assume, without deciding, that such use of evidence of speech is permissible under Mitchell, 508 U.S. 476, 113 S.Ct. 2194, we observe that it still remains unclear how the government would identify criminal mis-branding from communications between drug manufacturers and physicians authorized to prescribe drugs for off-label use. For example, would a manufacturer be guilty of mis-branding if it ships Xyrem to a doctor who, in placing his order, reveals that he prescribes the drug for off-label use — on a theory that the manufacturer now knows that the drug is not properly labeled for that use — but not if the manufacturer ships to a doctor who does not reveal that he prescribes the drug off-label? Because this case does not present us with that circumstance or others that might raise questions about the scope of the mis-branding proscription, we need not address them here.

. In Whitaker, cited by the dissent (Diss. Op. 14), the D.C. Circuit held that the labeling of a product, which was not approved by the FDA as a drug, constituted speech about unlawful activities and therefore did not enjoy First Amendment protection because it was unlawful to sell an unapproved product pursuant to claims about disease treatment. See Whitaker, 353 F.3d at 953.
The government does not contend that off-label promotion is in and of itself false or misleading. Of course, off-label promotion that is false or misleading is not entitled to First Amendment protection. See Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. Under 21 U.S.C. § 331(a), a defendant may be prosecuted for untruthfully promoting the off-label use of an FDA-approved drug, e.g., making false or misleading statements about a drug.
*166 The government did not argue at trial, nor does it argue on appeal, that the promotion in question was false or misleading. (See Trial Tr. 823 (mentioning, in government’s summation, that Caronia “did not give accurate and complete information in promoting and marketing Xyrem,” but focusing on promotion as misbranding and not pursuing argument that speech was false or misleading); Gov't Br. 58 (considering whether "the commercial speech in question clears [the] hurdle” of Central Hudson’s first prong, but not contending that the speech concerns unlawful activity or is false or misleading)).

. Physicians and pharmaceutical manufacturers can be held accountable for off-label drug use through medical malpractice and negligence theories of liability. See generally Boyle v. Revici, 961 F.2d 1060 (2d Cir.1992); Sita v. Danek Med. Inc., 43 F.Supp.2d 245 (E.D.N.Y.1999); Retkwa v. Orentreich, 154 Misc.2d 164, 584 N.Y.S.2d 710 (N.Y.Sup.Ct.1992).