**UNITED STATES of America, et al., EX REL. Daniel COYNE, M.D., Plaintiff,**

v.

**AMGEN, INC., Defendant.**

**CV 12–3881 (JMA)(AYS)**

United States District Court, E.D. New York.

January 17, 2017

---

Eric Owen Corngold, Christopher Leonard McCall, Friedman Kaplan Seiler & Adelman, New York, NY, David S. Rosenbloom, McDermott Will & Emery LLP, Chicago, IL, for Defendant.

Lori Aileen Siler, The Restaino Law Firm, Denver, CO, Kenneth J. Brennan, Tor hoerman Law, Edwardsville, IL, for Relator.

## REPORT AND RECOMMENDATION

SHIELDS, Magistrate Judge:

This case was commenced as a qui tam action pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 (the "FCA"). Plaintiff Daniel Coyne, M.D. ("Coyne" or "Plaintiff") brought the action as relator, seeking to represent the interests of the United States of America (the "United States"), the District of Columbia, and twenty-nine States (collectively the "Governmental Entities"). The case was commenced on August 6, 2012. See Docket Entry herein ("DE") 1. The presently operative amended complaint (the "Amended Complaint") was filed on January 5, 2015. DE 25.

All of the Governmental Entities have declined to intervene but Plaintiff is continuing, as is his right, to litigate this matter. Presently before this Court, upon referral by the Honorable Joan M. Azrack for Report and Recommendation, is Defendant's motion pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss the amended complaint. See Docket Entries herein ("DE") 38 (motion to dismiss) and order dated October 17, 2016 (referring motion).

After initial briefing of the motion, the parties submitted letters regarding additional authority in support of their positions. DE 39, 40. This Court held oral argument on the motion on January 4, 2017. Counsel for the United States observed the argument, and shortly thereafter submitted a letter addressing certain points raised during the course thereof. DE 42. In a letter dated January 11, 2017, Defense counsel responded to that letter, as well as a question raised by this Court during oral argument, DE 43. Upon consideration of all of the submissions before his Court, including the oral argument and the post-argument submissions, this Court recommends, for the reasons set forth below, that the motion be granted.

## BACKGROUND

### I. Documents Considered on Motion to Dismiss

As required in the context of this motion, Plaintiff's factual allegations, though disputed by Defendants, are accepted as true. All reasonable inferences are drawn from those allegations, and are construed in favor of Plaintiff.

■■■ While facts to consider in the context of a Rule 12 motion to dismiss are generally limited to those set forth in the pleadings, a court may consider matters outside the pleadings when determining, for purposes of a Rule 12(b)(1) motion, whether subject matter jurisdiction exists. M.E.S., Inc. v. Snell, 712 F.3d 666, 671 (2d Cir. 2013); Romano v. Kazacos, 609 F.3d 512, 520 (2d Cir. 2010); Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) aff'd. 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). In the context of a Rule 12(b)(6) motion, a court may consider: (1) documents attached to the complaint as exhibits or incorporated by reference therein; (2) matters of which judicial notice may be taken; or (3) documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the com-

plaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002); see International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).

Pursuant to these standards, this Court has considered in addition to the pleadings, publicly available labelling and packaging information promulgated by the Federal Food and Drug Administration that apply to the drug at issue in this lawsuit. The parties are aware of such publicly available information. Moreover, they have referred to and relied upon it in their pleadings and motion papers.

## II. Facts

### A. The Parties

Plaintiff Coyne is a medical doctor specializing in the areas of renal disease and nephrology. Coyne is board certified in both internal medicine and nephrology, and is a Professor of Medicine at Washington University School of Medicine. Defendant Amgen, Inc. ("Amgen") is a company engaged in the business of manufacturing and distributing biopharmaceuticals including, inter alia, a synthetically produced hormone marketed under the trade name "Epogen." At certain times prior to the complaint, Coyne served as a paid speaker for Amgen, assisting in its marketing of Epogen.

### B. Epogen

Epogen, Amgen's name for "epoetin alpha," is a drug that promotes red blood cell production. Epogen raises the level of hemoglobin, a protein in red blood cells that carries oxygen throughout the body. Hemoglobin is measured as "grams per deciliter" ("g/dl"). The normal range of hemoglobin levels for males is between 13 and 18 g/dl. For females, the normal range is between 12 and 16 g/dl. Broadly speaking, a low level of hemoglobin is referred to as anemia. Epogen's ability to increase hemoglobin levels has led to its use in the treatment of anemia. In particular, Epogen has been used in patients with chronic kidney disease ("CKD") undergoing kidney dialysis, nearly all of whom suffer from some level of anemia. Epogen is typically prescribed for such patients to raise hemoglobin levels and thereby avoid, or at least defer, the need for blood transfusion.

### C. FDA-Approved Packaging for Epogen

The Court details below certain information contained in the packaging of Epogen that has been approved by the Federal Food and Drug Administration (the "FDA" or the "Agency"). Because of the nature of Plaintiff's claims, the Court highlights language used with respect to "target" levels of Epogen, and statements as to Epogen's effect on "quality of life," and certain domains related thereto. It is the alleged marketing of Epogen to patients with hemoglobin levels of 11 g/dl (with the intent of increasing that level to 12 or above to improve their "quality of life") that forms the factual basis of Plaintiff's FCA claim. DE 25 ¶ 29.

The FDA first approved the use of Epogen for treatment of anemia in CKD patients in 1989. DE 25 ¶ 34. The 1989 approved packaging included information as to target hemoglobin levels, setting the target range at 10–11 g/dl. Statements regarding improved quality of life do not appear in the 1989 packaging. In 1994, the FDA approved new Epogen packaging, setting the target hemoglobin range at 10–12 g/dl. Statements as to improvements in quality of life first appeared as part of the FDA-approved Epogen packaging in 1994. See Exh. 1 to Memorandum of Law in Support of Motion to Dismiss (1994 FDA approved Epogen label) DE 38–2 at 5. Unlike the target level statements, which

appear in the "Indications and Usage" section, language as to quality of life, appears in the "Clinical Experience" section of the packaging. In the latter section, the packaging states that once target hematocrit levels were achieved, "statistically significant improvements were demonstrated for most quality of life parameters measured, including energy and activity level, functional ability, sleep and eating behavior, health status, satisfaction with health, sex life, well-being, psychological effect, life satisfaction and happiness." Exh. 1; DE 38–2 at 6. The statement as to improved quality of life does not distinguish between improvements made at specific points within the 10–12 g/dl target hemoglobin range, nor does it state specifically that those achieving a level of between 11 and 12 g/dl experienced increases in quality of life that differed from those who achieved hemoglobin levels of 10–11 g/dl. Instead, the packaging states only that once target levels were achieved, patients experienced improved quality of life as described therein.

In 2007, consistent with the FDA's evolving approach to statements as to patient-reported outcome claims, the label for Epogen began to refer to specific domains within the broader "quality of life" category.[1] Thus, in 2007, the Clinical Experience section of the Epogen label refers to the specific findings of a study conducted of 118 anemic dialysis patients who entered the study with average hemoglobin levels of approximately 7 g/dl. Those levels were increased by administration of Epogen to an average of approximately 11 g/dl. Instead of referring to the broad category of quality of life improvement,

the 2007 label states that study participants treated with Epogen "experienced improvements in exercise tolerance and patient reported physical functioning." [2]

Beginning in 2008, the FDA-approved Epogen label differed markedly from prior labeling in that it began to include a "black box" warning with respect to Epogen use by patients with renal failure.[3] That warning is not directed to quality of life indicators. Instead, it addresses cardiovascular issues, and states that "patients experienced greater risks for death and serious cardiovascular events" when using drugs in the Epogen class to "target higher versus lower hemoglobin levels." While this label thus recognized cardiovascular dangers associated with the targeting of higher hemoglobin levels, it made, as noted, no changes to prior quality of life language. Importantly, the new language made no change to the indications and usage section of the label, which continued to refer to use of Epogen to reach a target hemoglobin range of 10–12 g/dl.

In June of 2011, the FDA issued a "Drug Safety Communication" referring to the Epogen dosing regimen (the "2011 Statement").[4] That statement informs healthcare providers of modified recommendations for more conservative dosing of products such as Epogen. In conjunction with the 2011 Statement, the FDA-approved Epogen packaging underwent a substantial change. Like the 2008 label, the 2011 packaging contains a black box warning. The 2011 label, however, states that in controlled trials, patients experienced greater risks of death, serious ad-

1. See DE 43 at n.1 (citing to draft guidance); http://www.fda.gov/downloads/drugs/ guidances/ucm193282.pdf

2. http://www.accessdata.fda.gov/drugsatfda_ docs/label/2007/103234s5158lbl.pdf (at p. 63).

3. http://www.accessdata.fda.gov/drugsatfda_ docs/label/2008/103234s5164lbl.pdf (at p. 59).

4. http://www.fda.gov/Drugs/DrugSafety/ucm 259639.htm

verse cardiovascular reactions, and stroke when administered Epogen "to target a hemoglobin level of greater that 11 g/dl." That label further states that no trial identified a hemoglobin target level or dosing strategy that did not increase such risks.

For the first time since the 1989 approval of Epogen, the 2011 labelling abandons the use of any "target" range of hemoglobin to reach proper dosing levels of the drug. Instead, the labelling advises use of the "lowest" dose of Epogen "sufficient to reduce the need" for blood cell transfusion. This is an individual, patient centered approach, leaving it to the discretion of the prescribing physician to prescribe Epogen to raise hemoglobin levels in an appropriate effort to avoid blood transfusion. As for quality of life, while the 2011 label retained the 2007 language regarding the quality of life domains referred to therein, the "Limitations of Use" section of the 2011 Epogen label states that "Epogen has not been shown to improve quality of life, fatigue, or patient well-being." [5]

### D. The Relationship Between Hemoglobin Levels and Plaintiff's Claims

Plaintiff's claims center on the practice of prescribing Epogen to patients whose hemoglobin levels were at the high end of the FDA-approved target range, i.e., those with hemoglobin levels between 11 and 12 g/dl. Specifically, Plaintiff alleges that beginning in 1996 through at least 2010, Amgen caused the government to reimburse (through government funded-vehicles such as Medicare and Medicaid) Epogen prescriptions aimed at targeting hemoglobin levels above 11 g/dl. Amgen is not alleged to have submitted reimbursement claims for prescriptions aimed at individuals whose hemoglobin levels exceeded the tar-

get hemoglobin range of 10–12 g/dl. It is, however, alleged to have falsely claimed that administration of Epogen to individuals whose hemoglobin levels were within the higher end of the target range, i.e., between 11 and 12 g/dl, would result in improvement in quality of life. DE 25 at 38.

Citing to the reimbursement standard used by the Centers for Medicare and Medicaid Services ("CMS"), Plaintiff claims that prescribing Epogen to patients with higher levels of hemoglobin was neither "reasonable nor necessary for diagnosis or treatment of illness or injury, and did not provide any therapeutic or diagnostic benefit." DE 25 at 4; see 42 U.S.C. 1395y(a)(1)(A).

Drugs that fit within the CMS standard cited are properly reimbursed by government programs such as Medicare and Medicaid. Those that are not within this "reasonable or necessary" standard are not reimbursable. Where, as here, the drug at issue is prescribed for an FDA approved use, CMS takes the default position that a claim for payment is properly reimbursed. See 67 Fed. Reg. 66,718, 66,-756 (Nov. 1, 2002). At the same time, CMS retains the right to conduct its own reasonable and necessary determination in cases where, inter alia, a drug "represents a novel, complex or controversial treatment, may be costly to the Medicare program, may be subject to overutilization or misuse, or received marketing approval based on the use of surrogate outcomes." Id.

According to Plaintiff, Amgen knew, as a result of the findings of its own 1993 clinical trial (as described below) that administration of Epogen to individuals whose hemoglobin levels were within the higher

---

**5.** http://www.accessdata.fda.gov/drugsatfda_docs/label/2011/103234Orig1s5166_103234 Orig1s5266lbl.pdf

target range, i.e., between 11 and 12 g/dl, would result in no improvement in quality of life. DE 25 ¶ 38. Submission of reimbursement claims for this group of Epogen patients is therefore alleged to be responsible for the reimbursement of millions of dollars in claims that were neither reasonable nor necessary for medical treatment (according to CMS standards) and were not, therefore eligible for government-funded reimbursement.

The factual basis for Plaintiff's claims as to Amgen's knowledge lies in findings of a 1993 clinical trial conducted by Amgen as discussed below.

### E. Amgen's 1993 Normal Hematocrit Trial

In 1993, Amgen conducted a clinical trial, known as the "Normal Hematocrit Trial" (the "NHT" or the "Study"). The 1993 NHT randomized 1,265 dialysis patients who entered the Study with stable hemoglobin levels of 10–11 g/dl. Participants were randomly assigned to either the "Low Arm" of the study or the "High Arm." DE 25 ¶ 41. Participants in the Low Arm branch of the Study had their hemoglobin levels targeted to be maintained at the range of 9–11 g/dl. Those in the High Arm branch had their levels targeted to reach the range of 13–15 g/dl (a level closer to the normal levels referred to above). In May of 1996, after participants in the High Arm branch of the Study began to show an increase in the number of heart attacks and death, the Study was terminated. DE 25 ¶ 44. The NHT and its underlying data were not concealed by Amgen. Instead, in August of 1996, Amgen submitted the Study and all of its underlying data to the FDA. DE 25 ¶ 48. That data was part of Amgen's Clinical Trial Report to the FDA (the "ACTR"). Id.

Plaintiff refers to Amgen's analysis of the NHT results as using a statistical plan that was "in accordance with good trial practices and FDA requirements." DE 25 ¶ 45. At the same time, Plaintiff takes issue with the "unusually stringent statistical threshold for significance" employed by Amgen in the ACTR. DE 25 ¶ 48. It is Plaintiff's view that the results of the NHT "establish" that quality of life scores plateau at or before the 9–11 g/dl range. DE 25 ¶ 46. Any level beyond 11 g/dl is alleged to produce no benefit to quality of life. Specifically, Plaintiff alleges that the NHT results establish that "Amgen knew that treatment to any hemoglobin target above 11 g/dl had no likelihood of improving quality of life in dialysis patients with heart disease." DE 25 ¶ 47. Amgen is further alleged to have known that if the public was made aware of the results of the Study, Epogen would suffer from a drop in both profitability and marketability. Id.

### F. Factual Allegations Regarding Amgen's Post-NHT Activities

In addition to detailing the NHT data and Plaintiff's interpretation thereof, the Amended Complaint refers to publications and Amgen's activities following that 1993 clinical trial. Coyne refers to the use and analysis of the ACTR data in a 1998 article published in the New England Journal of Medicine (the "NEJM"). That article (the "1998 NEJM Article") is stated to have published the results of the NHT. DE 25 ¶ 55. Plaintiff states that the authors of the 1998 NEJM Article had "full access" to the NHT data. DE 25. ¶ 56. He takes issue with statements and conclusion reached in that article. In particular, he cites to author bias and refers to the conclusions reached therein as highly misleading. Id.

Plaintiff also makes reference to Amgen's participation in a "guideline writing organization," known as the Dialysis Outcomes Quality Initiative ("DOQI"), and

other professional groups. According to Plaintiff, such groups were used by Amgen to encourage the use of Epogen in anemic patients with higher levels of hemoglobin. Neither DOQI nor any other group is alleged to be an arm of the government, or any agency thereof. See DE 25 ¶ 53 (stating that DOQI is organized through the National Kidney Foundation). Amgen is alleged to have been the "founding and principal sponsor" of the DOQI guidelines, which are stated to recommend that physicians target hemoglobin to the level of 11–12 g/dl, characterized by Plaintiff as the "upper half" of the FDA approved target of 10–12 g/dl. Id. at ¶ 54. While this target range was within the FDA recommendations, Plaintiff states that the DOQI recommendation resulted in more "aggressive" anemia treatment than indicated by the FDA label (which recommended a target hemoglobin level of 10–12 g/dl). Plaintiff similarly alleges that Amgen helped to fund patient advocacy groups such as the American Association of Kidney Patients, and "select anemia experts" that promoted the use of Epogen to increase hemoglobin levels above 11 g/dl. DE 25 ¶¶ 62; 68.

G. Plaintiff's 2003 Suspicions and the 2008 FOIA Request

Plaintiff's complaint refers to his suspicions being raised in 2003, while he was making medical presentations on behalf of Amgen. He states that he found the presentation materials provided by Amgen to be both puzzling and illogical. DE ¶ 72. Specifically, Plaintiff took issue with what he refers to as the "associational" nature of Amgen's conclusions. He therefore performed his own statistical tests, and began to discuss his suspicions and concerns with other members of the medical community and the government. DE 25 ¶¶ 74–75. In particular, Coyne contacted a Senior Health Investigative Counsel for the Senate Finance Committee, as well as the

FDA. The Agency is alleged to have advised Coyne to make a Freedom of Information Act ("FOIA") request for the 1993 NHT data. DE 25 ¶ 81–84.

Plaintiff made the suggested FOIA request in 2008. It was not fulfilled until 2011. There is no question but that Plaintiff's FOIA request was directed to the FDA, and sought material in that agency's possession since 1996. Nor is there any question that the information sought and obtained forms the basis for the FCA claims raised in this lawsuit. Although, as noted, the NHT data was provided to the FDA and, according to Plaintiff, was fully available to the authors of the 1998 NEJM Article, Plaintiff alleges that the ACTR (the document including the NHT data) "was not a public document, and was not seen by any of the public until Dr. Coyne obtained a copy of it in 2011," pursuant to his FOIA request. DE 25 ¶ 48.

Coyne states that shortly after he received the data requested in his FOIA request, the Epogen labelling was changed to reflect the 2011 packaging referred to above. As noted, that packaging abandons the use of target levels, and makes no statements regarding "quality of life." Plaintiff takes credit for this change. Additionally, he relies on this 2011 label change as vindication of his litigation position, and proof that his scientific interpretation of the ACTR data was not only correct, but known to Amgen during the time that it was submitted the allegedly fraudulent claims.

II. Plaintiff's Claims and Prior Proceedings

As noted, Plaintiff alleges that Amgen is responsible for the submission of false claims for payments made by governmental agencies such as Medicare and Medicaid for doses of Epogen that were neither

medically necessary nor reasonable. The factual underpinning, as described in detail above, of Plaintiff's claims is that data from the abandoned NHT establish that raising hemoglobin levels above 11g/dl have no effect on quality of life. DE 25 ¶ 50. Plaintiff categorizes statements regarding quality of life as "labeling claims," DE 24 ¶ 52, and alleges that any time Epogen was prescribed for patients with hemoglobin levels in excess of 11 g/dl, with the intent of raising the level to 12 g/dl, such prescriptions were not medically necessary for the diagnosis or treatment of illness or injury, not properly reimbursable, and therefore false.

The presently operative complaint states that Amgen's submission of false claims took place between 2006 and 2010. At oral argument, Plaintiff's counsel stated that such claims continued through 2011. All such submissions are alleged to have violated Sections 3729 and 3730 of the False Claims Act, 31 U.S.C. § 3732. In likely recognition of the facts that the data analyzed and relied upon by Coyne is study information submitted to the FDA in 1996, and that the legal characterization of that data might affect his FCA claims, Plaintiff alleges that there was no "public disclosure" of the data upon which he relies. He further argues that if there was such disclosure, he is responsible for the voluntary disclosure of such information, and that he had knowledge independent of that data which materially added to the publicly disclosed allegations or transactions.

### III. The Motion to Dismiss

Defendant moves to dismiss. The motion argues that Plaintiff's claims are barred by the FCA "public disclosure" bar, failure to plausibly allege submission of any false claim, and by the applicable statute of limitations. The Court turns to discuss the legal principles applicable to the motion, and to the disposition thereof.

### DISCUSSION

### I. Legal Principles: Standards Applicable on Rule 12 Motions to Dismiss

■ A Rule 12(b)(1) motion is properly granted where a plaintiff fails to plausibly establish subject matter jurisdiction. A case is properly dismissed under Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate it. See Fed. R. Civ. P.12(b)(1). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court, may refer to evidence outside the pleadings. See Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). A plaintiff bears the burden of proving the existence of subject matter jurisdiction. See Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996); Ulysse v. FreshDirect, LLC., 2015 WL 5692938, at * 2 (E.D.N.Y. September 28, 2015).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 119–20 (2d Cir. 2010). Facial plausibility is established by pleading factual content sufficient to allow a court to reasonably infer the defendant's liability. Twombly, 550 U.S. at 556, 127 S.Ct. 1955. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 555, 127 S.Ct. 1955. Nor is a pleading that offers nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," sufficient.

Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

■ The issue in the context of this motion to dismiss is not whether Plaintiff has established a prima facie case as to subject matter jurisdiction and his claims, but whether he pleads facts in plausible support thereof. The elements of the prima facie case are considered because they "provide [a helpful] outline of what is necessary to render [a plaintiff's] claims for relief plausible." Friel v. County of Nassau, 947 F.Supp.2d 239, 251 (E.D.N.Y. 2013) (quoting Sommersett v. City of New York, 2011 WL 2565301, at *5 (S.D.N.Y. 2011).

## II. The Federal False Claims Act

### A. General Principles

■ The False Claims Act, which imposes "significant penalties on anyone who 'knowingly presents . . . a false or fraudulent claim for payment or approval'" to the Federal Government was enacted in 1863 to stop "massive frauds perpetrated by large contractors during the Civil War." Universal Health Servs., Inc. v. United States ex rel. Escobar, — U.S. —, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016) (hereinafter "Escobar"); see 31 U.S.C. § 3729(a)(1)(A). The FCA has since been "repeatedly" amended, but its focus remains on imposing liability on those "who present or directly induce the submission of false or fraudulent claims." Id. Thus, the FCA imposes liability on one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government; or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." United States ex rel. Polansky v. Pfizer, Inc., 822 F.3d 613, 617 (2d Cir. 2016) (quoting 31 U.S.C. § 3729(a)-(b));

see State Farm Fire and Cas. Co. v. Rigsby, — U.S. —, 137 S.Ct. 436, 440, 196 L.Ed.2d 340 (2016). To properly state a false claim under FCA sections 3729(a)(1)(A) and 3729(a)(1)(B) a relator must plausibly claim that that the defendant: (1) made a claim, (2) to the government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury. United States v. Northern Adult Daily Health Care Center, 205 F.Supp.3d 276, 286–87, 2016 WL 4703653, at *4 (E.D.N.Y. September 7, 2016). The FCA scienter requirement defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). False claims within the FCA include fraudulent requests for reimbursement under government benefit programs such as Medicare and Medicaid. See Polansky, 822 F.3d at 617.

### B. The Public Disclosure Bar

As originally enacted, the FCA broadly allowed a qui tam relator to state a claim even if the information relied upon in support of the lawsuit was already in the public domain. Graham Cty. Soil and Water Conservation Dist. v. Wilson, 559 U.S. 280, 294, 130 S.Ct. 1396, 1406, 176 L.Ed.2d 225 (2010). The FCA was amended in 1943 to preclude qui tam lawsuits "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." Id. at 294, 130 S.Ct. at 1406. Because this amendment led to a "dwindling" of FCA lawsuits, Congress again amended the FCA to strike the proper balance between encouraging legitimate "whistle-blowing insiders with genuinely

valuable information" while also discouraging "opportunistic plaintiffs" with "no significant information to contribute of their own." Id. at 294, 130 S.Ct. at 1406; see also New York ex rel. Khurana v. Spherion Corp., 2016 WL 6652735 *9 (S.D.N.Y. November 10, 2016) (purpose of public disclosure bar is to bar "parasitic" lawsuits" based upon publicly disclosed information). The current iteration of the FCA public disclosure bar requires dismissal of a qui tam lawsuit "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in the settings enumerated in the statute. 31 U.S.C. § 3730(e)(4)(A)(i-iii).

■ A qui tam claim is deemed "substantially the same" as publicly disclosed information where there has been a public disclosure of "all critical or material elements of the allegedly fraudulent transaction," and relator's claims are based upon such previously disclosed information. United States ex rel. Kirk v. Schindler Elevator Corp., 437 Fed.Appx. 13, 16 (2d Cir. 2011); see also United States ex rel. Oliver v. Philip Morris USA Inc., 826 F.3d 466, 472 (D.C. Cir. 2016) (qui tam lawsuit is deemed to be based upon publicly disclosed documents where the allegations or transactions in the complaint are substantially similar to those that have been publicly disclosed); Chen ex rel. United States v. EMSL Analytical, Inc., 966 F.Supp.2d 282, 298 (S.D.N.Y. 2013) (public disclosure bar applies to claims if the information disclosed was sufficient to "set the government squarely upon the trail" of the defendant's participation in the alleged fraud) (quoting In re Natural Gas Royalties, 562 F.3d 1032, 1041 (10th Cir. 2009).

The Supreme Court has broadly interpreted the scope of documents encompassed by the public disclosure bar. See Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 408, 131 S.Ct.

1885, 1889, 179 L.Ed.2d 825 (2011). Thus, that Court has held specifically that documents produced by government agencies in response to FOIA requests constitute publicly disclosed "reports" under the FCA. Id. at 410–11, 131 S.Ct. at 1893. Accordingly, any qui tam claims that are based upon substantially the same allegations or transactions that were publicly disclosed in response to a FOIA request are within the statutory bar.

A qui tam lawsuit is barred under the foregoing analysis unless the relator qualifies as an "original source" of the information upon which his claims rely. 31 U.S.C.§ 3730(e)(4)(B). Two versions of the FCA "original source" definition are relevant to this action—that enacted in 1986 and in 2010. Both versions prevent relators from basing FCA lawsuits on publicly disclosed information, unless the relator is an "original source" of that information. While the statutes differ in their identification of those documents that fall within the public disclosure bar, both versions include documents within the category at issue here, i.e., those that have been previously disclosed in Federal administrative hearings and investigations. See 31 U.S.C. § 3730(e)(4)(A)(i-iii). As noted, the Supreme Court has included documents produced in response to FOIA requests as falling within that category. Schindler, 563 U.S. at 408, 131 S.Ct. at 1889.

The 1986 and 2010 versions of the FCA differ in defining whether a relator is an "original source" of information. Under the 1986 statute, a relator qualifies as an original source of a publicly disclosed document only if he has "direct and independent" knowledge of facts that were voluntarily disclosed to the government. 31 U.S.C. § 3730(e)(4)(B)(1986) (emphasis added). The 2010 version of the statute qualifies a relator as an "original source," if, prior to public disclosure he "has voluntarily dis-

closed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B). The 2010 version of the FCA grants original source status to a relator who has knowledge that is "independent of and materially adds to the publicly disclosed allegations or transactions, and ... has voluntarily provided the information to the Government before" the filing of the FCA lawsuit. 31 U.S.C. § 3730(e)(4)(B) (2010) (emphasis added). See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 210 (1st Cir. 2016).

## II. Disposition of the Motion

### A. The Public Disclosure Bar

#### i. Retroactivity

■ In light of the fact that this matter was commenced after 2010, but arguably alleges that false claims were submitted both before and after 2010, this Court considers as a threshold matter, whether to apply the 1986 or 2010 version of the FCA. For the newer statute to apply, its application must be deemed retroactive. This issue has not been decided by the Second Circuit, and other courts have reached different conclusions at to which statute applies. Compare Cause of Action v. Chicago Trans. Auth., 815 F.3d 267, 273–74 n.6 (7th Cir. 2016) (2010 amendment to § 3730(e)(4)(B) is "not subject to a retroactivity bar," and applies "regardless of when a person claiming to be an original source acquired his knowledge") with United States ex rel. Antoon v. Cleveland Clinic Found., 788 F.3d 605, 614–15 (6th Cir. 2015) (applying 1986 statute to events that took place prior to 2010); and United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 915 (4th Cir. 2013) (same); see also United States ex rel. Siegel v. Roche Diagnostics, Corp., 988 F.Supp.2d 341, 345 (E.D.N.Y. 2013) (applying 2010

statute to case relying on pre–2010 conduct, without discussion of retroactivity in case that did not turn on analysis of public disclosure bar but was instead decided on Rule 9(b) grounds).

In view of the holding below that Plaintiff fails to plausibly allege original source status under either the 1986 or 2010 version of the public disclosure bar, this Court need not decide which version of the FCA to apply. Plaintiff fails to state a claim under either version of the statute.

#### ii. The Public Disclosure Bar Mandates Dismissal of the Amended Complaint

■ As an initial matter, the Court holds that there is no doubt that the documents forming the basis of Coyne's qui tam complaint are those that were in the possession of the FDA no later than 1996. Those documents, which consist of the data submitted by Amgen to the FDA when the NHT was halted, were produced by the Agency pursuant to Coyne's FOIA request. As such, the documents fall squarely within the category of those that may be recognized as publicly disclosed. Schindler Elevator Corp., 563 U.S. at 410, 131 S.Ct. at 1893 (2011) (agency response to FOIA request falls within the meaning of "reports" subject to the public disclosure bar). Coyne cannot plausibly allege that disclosure to the FDA was somehow not disclosure to CMS, so as to avoid the conclusion that the NHT data was, in fact, publicly disclosed. No case law supports any such argument. Moreover, this Court cannot envision an interpretation of the FCA that would require separate disclosures to different arms of the government in order to find that such information was, in fact, public.

In view of the fact that the information upon which Coyne's claims rely is the

same information disclosed to the government, the Court need not inquire as to whether the information relied upon is the "core information" underlying Coyne's allegations. Coyne's information *is* the data that was revealed in the publicly disclosed data. Thus, Coyne's amended complaint refers repeatedly to that data and relies on his interpretation thereof to support his claims.

 Characterization of the documents as publicly disclosed does not, however, end the inquiry. Instead, the Court must determine whether Coyne has alleged facts in support of a plausible claim that he is, nonetheless, an "original source" of information within the meaning of the FCA. See Schindler, 563 U.S. at 415, 131 S.Ct. at 1895 (noting that a relator relying on FOIL documents may nonetheless qualify as an original source of information upon which an FCA claim relies); United States ex rel. Davis v. Dist. of Columbia, 679 F.3d 832, 836 (D.C. Cir. 2012) ("if a *qui tam* suit is 'based upon' a 'public disclosure,' the suit is barred unless the relator is an "original source") (emphasis added).

Under the 1986 statute Coyne would have to show original source status to establish subject matter jurisdiction. Under the 2010 statute, the Court would decide whether any such allegation is plausible under the Rule 12(b)(6) standard. In either event, to survive the public disclosure bar, Coyne must plausibly allege that he is an original source of voluntarily disclosed information that constitutes "direct and independent knowledge *of the information* on which the allegations are based" (under the 1986 statute), § 3730(e)(4)(B) (2006)(emphasis added), or "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" (under the 2010 statute) (emphasis added). Id.

 In an effort to show that he disclosed any independent knowledge that materially added to publicly disclosed information, Coyne relies on his suspicions and scientific interpretation of the ACTR data, as well as discussions he had with public officials regarding the same. Even application of the generous 2010 original source standard cannot save Coyne's claims. Importantly, to show that he has alleged plausible original source status by "materially" adding to the publicly disclosed information, Coyne must show that his information "is "[o]f such a nature that knowledge of the item would affect a person's decision-making," is "significant," or if it is "essential." United States ex rel. Winkelman. v. CVS Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016) (citing Black's Law Dictionary, 1124 (10th ed. 2014); accord United States ex rel. Paulos v. Stryker Corp., 762 F.3d 688, 695 (8th Cir. 2014) (noting that "materially" means "substantially" or "considerably"). Such information must add some new "value" to that which is already in the public domain. United States ex rel. Davis v. Dist. of Columbia, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012); United States ex rel. Hoggett v. Univ.of Phoenix, 2014 WL 3689764, at *9 (E.D. Cal. July 24, 2014) (knowledge that "materially" adds to public information must be "qualitatively different" from information previously disclosed and "not merely the product and outgrowth of publicly disclosed information"). In contrast, merely "adding color" to previously disclosed information is insufficient to materially add to that information. Winkelman, 827 F.3d at 212. See also Escobar, 136 S.Ct. at 1996; 2003–04 (applying essentially same "demanding" and rigorous" materiality standard to FCA "implied false certification" claims). Applying this materiality standard to Coyne's allegations leads to the inescapable conclusion that he does not allege disclosure of any information that materi-

ally added to that which was already disclosed.

■ Coyne alleges that his view of the 1993 data establishes the fact that certain Epogen prescriptions were unnecessary (and therefore not properly reimbursable) because of his analysis as to what the 1993 data says about quality of life. As such, he bases his claims on his particular analysis of what the NHT data demonstrated. Such suspicions and a scientific disagreement as to the proper interpretation of publicly disclosed data underlying a study that halted prior to completion cannot, as a matter of law, have materially added to the government's knowledge. "Disagreements over scientific opinion, methodology, and judgments" are insufficient to state a claim under the FCA. United States ex rel. Harris v. Bernad, 275 F.Supp.2d 1, 6 (D.D.C. 2003).

Coyne substitutes his own judgment as to the aims of the 1993 Study. That study, however, was not so limited. As even Coyne pleads, the NHT was aimed at discerning Epogen's effect on mortality, survival and quality of life, and not just at determining the effect of higher dosing levels on quality of life. DE 25 ¶ 40. In any event, the data relied upon cannot be plausibly relied upon to reach a conclusion as to the necessity of particular Epogen prescriptions. Again, that data is nothing more than information gathered up at the early termination of a study. It cannot form the basis of any scientific conclusions, much less relied upon to support the blanket conclusion that FDA-approved prescriptions should not have been reimbursed.

■ In sum, Coyne's individual suspicions and calculations are not sufficiently or qualitatively different from the core information within the government's possession such that it would make a difference to the decision as to whether to reimburse

the class of Epogen prescriptions at issue. It is worth noting, again that all of those prescriptions were squarely within the dosages specifically approved by the FDA, and therefore fall presumptively within those that CMS deemed reimbursable. As noted by the Second Circuit in Polansky, (adopting the reasoning of the District Court), even the "broadest" application of the FCA "was never intended to be used as a back-door regulatory regime to restrict practices that the relevant federal and state agencies have chosen not to prohibit through their regulatory authority." Polansky, 822 F.3d at 620 (quoting United States ex rel. Polansky v. Pfizer, Inc., 914 F.Supp.2d 259, 266 (E.D.N.Y. 2012)).

Nor does the 2011 labelling serve to vindicate Coyne's views, or his status as an original source of information. According to Coyne, the 2011 labelling makes reimbursement improper for patients with hemoglobin levels of more than 11 g/dl, but less than 12 g/dl. Such dosages however, remain within the scope of the 2011 labelling. While the indications set forth in the 2011 label abandon the use of target ranges of hemoglobin, the label allows reimbursement for Epogen prescriptions that are aimed at avoiding transfusion. As in the past, any statements as to quality of life, or domains falling therein, are not part of the indications for usage section. In any event, there is no question but that several additional studies and scientific research regarding drugs like Epogen and anemia took place between the 1993 NHT and the 2011 label change. Indeed, the FDA's "Drug Safety Communication" announcing the 2011 modification in Epogen dosing recommendations cites not only to studies conducted between 2007 and 2009, it also refers to the Agency's response to a citizen petition filed in 2009 and 2010 by the President of the Medical Technology and Practice Patterns Institute seeking

such a change.[6] Public documents thus make clear that the 2011 label changes reflect the development of scientific data between 1993 and 2011, and not Coyne's suddenly accepted view as to what the 1993 data established.

In sum, for the reasons set forth above, there was a public disclosure of the information forming the basis of Coyne's claims herein. Additionally, whether the 1986 or 2010 FCA is applied, Coyne cannot claim original source status so as to allow his claims to survive the public disclosure bar. Accordingly, his claims must be dismissed.

### B. Matters Raised as to *Polansky* and the Impact of FDA Approval on FCA Claims

Much has been made by Amgen, Coyne, and the United States as to whether an FCA claim is barred, as a matter of law, because Amgen is alleged only to have engaged in "on-label" marketing and requests for reimbursement at dosages expressly approved by the FDA.[7] While the Court has dismissed Coyne's claims pursuant to the public disclosure bar, it addresses briefly this broader argument that has been made in the parties' submissions, both prior to and after oral argument.

Amgen contends that squarely "on label" prescribing bars, as a matter of law, any FCA claim based upon an allegedly fraudulent request for reimbursement. It relies principally on the holding of the Second Circuit in Polansky v. Pfizer, 822 F.3d 613 (2d Cir. 2016), which expressly adopted the holding of the District Court. In particular, Amgen cites to the warning, referred to above, against allowing an FCA claim to become a "back-door regula-

tory regime," as well as the District Court's conclusion that "defendant has not engaged in off label marketing, and therefore has not violated the FCA." Polansky, 914 F.Supp.2d 259, 266 (E.D.N.Y. 2012).

Plaintiff argues that Polansky is not to be so broadly interpreted. Coyne draws a distinction between whether the FDA has approved a use as safe and effective and the CMS "reasonable and necessary" reimbursement standard. DE 40. He argues that unlike the plaintiff in Polansky, his claim does not allege off-label marketing, but instead alleges "concealment of information" from agencies making reimbursement decisions. DE 40. Coyne alleges that "but for" Amgen's "concealment" of information regarding targeting higher levels of hemoglobin, government agencies such as Medicare and Medicaid would not have reimbursed prescriptions aimed at the higher target levels—whether or not such prescriptions were "on label."

The United States also weighs in on Plaintiff's side of the debate. In particular, it states that if a pharmaceutical company were to receive approval for a drug, but later discover information as to the safety or efficacy of on-label use, the failure to report such information to the government could result in FCA liability. DE 42. It joins Plaintiff in arguing that Polansky did not address Plaintiff's theory of liability, and argues that the case should therefore not be read as broadly as proposed by Amgen.

Plaintiff and the Government correctly characterize the claim of the qui tam Plaintiff in Polansky who alleged that Pfizer "pursued an off-label marketing scheme," that resulted in reimbursement for pre-

---

6. http://www.fda.gov/Drugs/DrugSafety/ucm 259639.htm#table

7. On label prescriptions are those for conditions/dosages that are within those indicated

by the label approved by the FDA. See Polansky v. Pfizer, Inc., 2009 WL 1456582 *1 (E.D.N.Y. 2009).

scriptions other than those indicated by the label. Polansky, 2009 WL 1456582, at *1 (E.D.N.Y. 2009) ("Polansky I"). Plaintiff there based his FCA claim on the theory that the marketing at issue amounted to "off-label" marketing because of an alleged failure to follow non-FDA mandated "guidelines." Polansky I at *2. After dismissal on Rule 9(b) pleading grounds, Plaintiff amended his complaint and the claims was thereafter dismissed on the merits. See Polansky v. Pfizer, 914 F.Supp.2d 259 (E.D.N.Y. 2012) ("Polansky II"). The District Court dismissing the amended complaint rejected the notion that the guidelines at issue rendered certain on-label prescriptions fraudulent, and granted the motion to dismiss. Because the defendant had not engaged in the off-label marketing alleged by the plaintiff, the Court held there was no FCA violation stated. Polansky II, 914 F.Supp.2d at 266.

There is no doubt that a broad application of the particular language quoted from Polansky could bar any FCA claim where the prescription at issue was within FDA labelling requirements. It is worth remembering, however, the context in which that language arose. Plaintiff in Polansky specifically argued that the marketing at issue constituted off-label marketing. Plaintiff here tries to allege some kind of concealment and not off label marketing. In view of the dismissal of this case on the ground that Plaintiff's claims fall within the public disclosure bar, it is unnecessary to reach a broad conclusion as to whether on-label marketing can ever constitute a fraudulent request for reimbursement under the FCA. Nor is it necessary to address the scenario proposed by both the Plaintiff and the United States, i.e., whether FCA liability could attach where a drug manufacturer has concealed information material to the FDA's decision to allow certain dosages or marketing. Where, as here, however, the information forming

the basis of any claim of "concealment" was disclosed to the government by the manufacturer and, indeed, is sufficient to apply the public disclosure bar, no false claim can exist.

III. Impact of Dismissal on the United States

This Court recommends dismissal for failure to state a claim. The United States requests that such dismissal be without prejudice to soliciting the written consent of the Government. See DE 31; 42. This is in accord with 31 U.S.C. § 3730(b)(1), which provides that this action may be dismissed only with the written consent of the Attorney General. See DE 31. It is therefore further recommended that the United States Government be granted two weeks from any final decision of the District Court as to this Report and Recommendation to advise as to its final position in this matter.

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendant's Motion to Dismiss for failure to state a claim, appearing as Docket Entry No. 38 herein, be granted in its entirety and that the United States Government be granted two weeks from the District Court's final decision on this Report and Recommendation to set forth its position regarding its consent to any dismissal.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of

time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").